Filed 3/20/25  In re N.F. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re N.F., a Person Coming Under the Juvenile Court Law. | B337789 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>Najam F.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 23CCJP00378B) |

APPEAL from orders of the Superior Court of Los Angeles County, Tiana J. Murillo, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

Appellant Najam F. (father) appeals from juvenile court final custody orders declining to order visitation for father and minor N.F. We affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### I. Facts

In 2019, DCFS received a referral indicating that father choked mother and hit her in the head. Mother reported that she fell while running away from father with N.F.'s half sibling, and the child sustained a black eye and a cut that required stitches and became a large scar. The referral was closed as inconclusive.

While mother was pregnant with N.F., father was convicted of mayhem, and he went to prison before the child was born. He was released on parole in August of 2022. N.F. was two years old at the time. A restraining order prohibited father from contacting mother until November 15, 2022. Father and mother spent time together soon after father's release, which father admitted was a violation of his parole. Mother let father stay at her home occasionally, but she kicked him out on or about November 25.

On November 27, 2022, the Los Angeles County Department of Children and Family Services (DCFS) received a referral indicating that father and mother got into a violent

---

[1] We grant respondent's motion to augment the record on appeal to include the November 1, 2023 six-month status review report, which was filed with the juvenile court. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

2

argument in N.F.'s presence.  Mother reported that on November 26, she was sleeping in her bedroom around midday when father came into the room and started arguing with her.  Father was there to move a bed out of the home.  Father took an iPad from mother, and when mother tried to get it back, father punched her twice, pushed her, and tried to punch her again.  N.F. and her half sibling were in the room.  After the fight, mother had redness and scratches on her arms.  She obtained an emergency protective order barring father from contacting her until December 2.

In early December, mother told a DCFS social worker that the November incident did not involve father, but was instead a dispute between mother and two men from whom she bought a mattress.  She asserted that she had had no contact with father since 2019.  However, the next month, mother admitted to the social worker that she had lied initially.  She confirmed that father came to her home in November to pick up a bed and refused to leave.  Mother locked herself in a room with N.F., but father "burst through the door" and "a tussle ensued."

A DCFS social worker also interviewed father in December. He asserted he had never seen N.F. in person and had never had any contact with her, and said he had no relationship with mother.

On January 20, 2023, DCFS received another referral involving N.F.  Mother reported that father approached her as she was carrying N.F. up the stairs to her home.  Father "demanded to take the child" and tried to "rip" her out of mother's arms.  When mother resisted, father bit her forearm, leaving swelling, redness, and a bite mark.  They argued for about 30 minutes and father eventually left.  After mother went inside,

she heard a loud bang, and when she went back outside she found that her car windshield had been smashed.  Early the next morning, mother's car was set on fire.  Father texted mother kiss emojis shortly after the fire.  Mother believed father broke the windshield and set the fire.  She got another emergency protective order prohibiting father from contacting her through January 27.

In late January, a DCFS social worker interviewed father about the two incidents.  Father said he went to mother's home in November to pick up a bed, at her request.  According to father, mother instigated the fight and punched him twice in the face.  As to the January incident, father claimed he came over to mother's home with her permission and took N.F. to get some chips at a corner store.  Father then asked mother if he could take N.F. with him for the day, but mother said no.  According to father, mother then tried to "snatch" N.F. from him.  Father returned N.F. to mother and left.  He denied that he bit mother, broke her windshield, or set her car on fire.

Father also accused mother of infidelity and told the social worker that he doubted N.F. was his child.  He asked for a paternity test because he did not want to participate in the dependency proceedings if he was not related to N.F.

DCFS records indicated that father had a history of similar violent behavior.  In 2014, DCFS learned of a police report indicating that father punched a woman in the head and dragged her by the hair in the presence of a three-month-old child.  Father admitted to a DCFS social worker that he hit the woman but denied doing so in front of a child.  The victim said father had assaulted her once previously.  In 2017, DCFS received a referral indicating that father grabbed his girlfriend "by the neck, lifted

4

her off the ground," and threatened to kill her. When the victim's son told father to stop, father backhanded the child in the face.

## II. Procedure

On January 26, 2023, DCFS requested an order authorizing removal of N.F. from mother and father. The juvenile court granted the request the next day.

On January 31, DCFS filed a Welfare and Institutions Code section 300 petition as to N.F.[2] The petition alleged that mother and father got in a domestic violence incident in 2019 which caused injury to N.F.'s half sibling, that father "repeatedly struck" and "pushed" mother on November 26, 2022, and that he bit her while trying to pull N.F. away on January 20, 2023. It further alleged that this violence endangered N.F. and her half sibling and placed them at serious risk of harm.

When a DCFS social worker discussed the petition with father, he denied that he was at mother's home on November 26, 2022, or on January 20, 2023.

In February, at the detention hearing, the juvenile court ordered N.F. removed from mother and father pending disposition of the petition. The court found that father was N.F.'s alleged father, noting that he was not married to mother and did not sign N.F.'s birth certificate.

Father was not present at the February detention hearing. The court noted that father was "in the vicinity earlier" but "may have been detained." Father later confirmed that he was arrested when he came to court that day.

---

[2] All further undesignated statutory references are to the Welfare and Institutions Code.

The juvenile court ordered that father be removed from jail and transported to court for a March 7 arraignment hearing. Father refused to exit his cell and he missed the hearing.

On March 20, father filed a statement regarding parentage which asked the juvenile court to find that he was N.F.'s presumed father. The court appointed counsel for father the next day. It also appointed an expert and ordered a paternity test to determine father's biological relationship to N.F.

The juvenile court held a jurisdiction and disposition hearing on May 17. Father, who was still incarcerated, attended the hearing. The court sustained the petition. It declared N.F. a dependent of the court and removed her from mother's and father's custody. The court found that father remained an alleged parent because his paternity test was still pending, but it exercised its discretion to provide him with reunification services. The court ordered father to complete a 52-week domestic violence course, developmentally appropriate parenting programs, and individual counseling. It also ordered that father have monitored visits with N.F., including phone and video visitation, subject to restrictions at father's penal facility.

Later in May, the superior court entered a criminal protective order barring father from contacting N.F. or mother until 2033.

In August, father told a DCFS social worker that he had signed up for parenting classes. The social worker attempted to confirm this with the prison, but by November 15, DCFS had received no verification of father's enrollment in any services.

In November, mother was actively participating in services and had regularly visited with N.F.

At the November 15, 2023 six-month review hearing, the juvenile court found that mother had substantially complied with her case plan and that returning N.F. to mother would not create a substantial risk to the child's safety. It therefore returned N.F. to mother's physical custody and ordered family maintenance services for mother. The court found that father had not substantially complied with his case plan and ordered enhancement services for him.

In May of 2024, father reported that he was on a waiting list for unspecified classes. At that time, father remained incarcerated and was housed in a restricted unit for disciplinary reasons, and the unit did not offer the classes father had requested.

On May 15, 2024, the court held a judicial review hearing. Citing mother's progress, it found that the conditions justifying dependency jurisdiction over N.F. no longer existed, terminated jurisdiction, and ordered that mother have sole legal and physical custody over the child.

The court also found that father was N.F.'s biological father based on the results of a paternity test.[3] Father recognized that, as a biological father, he was not entitled to visitation. He also acknowledged that a criminal protective order barred him from contacting N.F. until 2033. Father nonetheless asked the court to

_____

[3] "A biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status" under the requirements set out in Family Code section 7611. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 449, fn. 15 (*Zacharia D.*); *In re Jason J.* (2009) 175 Cal.App.4th 922, 932.) Father does not argue on appeal that the juvenile court erred in finding that he was N.F.'s biological father and not her presumed father.

exercise its discretion to order visitation with N.F. subject to the protective order, noting that "things often do change." Father also asked to receive photographs of N.F. every three months. The court rejected father's requests and ordered that any potential visitation permitted by mother must be monitored.

On May 16, the court entered a final judgment and visitation order consistent with the rulings described above. Father timely appealed the juvenile court findings and orders entered on May 15 and 16, including the order that father have no visitation with N.F.

## DISCUSSION

When the juvenile court terminates jurisdiction over a minor previously adjudged a dependent of the court, it has discretion to issue exit orders, including visitation orders. (§ 362.4, subd. (a); *In re A.C.* (2011) 197 Cal.App.4th 796, 799.) A biological father is not entitled to visitation. (*Zacharia D.*, *supra*, 6 Cal.4th at p. 451 ["only a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services"]; § 362.1, subd. (a)(1)(A) [visitation is part of reunification services].) However, "the juvenile court may order services for the child and the biological father, if the court determines that the services will benefit the child." (§ 361.5, subd. (a).)

We review a juvenile court's exit orders for abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 (*Stephanie M.*).)

8

Father argues that the juvenile court abused its discretion in denying his request for visitation with N.F. We disagree. Father was in prison for N.F.'s entire life except for a six-month period, during which time father got into two violent fights with mother in the child's presence. Father reported that he took N.F. to get chips before one of the fights, but the record does not reflect that father otherwise ever visited or interacted with N.F. (Cf. *Zacharia D.*, *supra*, 6 Cal.4th at p. 451 [declining to interpret " 'parent' to include a strictly biological father . . . who had never demonstrated any commitment to the child's welfare"].) Father also had a larger history of violent conduct, including one incident in which he reportedly struck a child. Father signed up for classes, but there is no evidence that he ever engaged in any of the reunification or enhancement services offered by the juvenile court. Finally, a criminal protective order prohibited father from contacting N.F. until 2033, meaning any visitation order would be meaningless until that order expires or is modified.[4] Based on the overall circumstances, the court's order was well supported and did not exceed the bounds of reason. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319; *In re Elijah V.* (2005) 127 Cal.App.4th 576, 589 (*Elijah V.*) [juvenile court did not abuse its discretion in denying reunification services to a

---

[4] If the protective order is modified, or after it expires, father may seek modification of the visitation order "in a proceeding or action described in Section 3021 of the Family Code" if he can establish "that there has been a significant change of circumstances since the juvenile court issued the order and modification of the order is in the best interests of the child." (§ 302, subd. (d); *In re Rashad D.* (2021) 63 Cal.App.5th 156, 165, fn. 7.)

biological father who "had no relationship with" the child and was being investigated for child abuse].)

Father argues that visitation was warranted because he showed "commitment" to N.F. by attending "most" hearings in the dependency proceedings, requesting services, and seeking a paternity test. Yet, father fails to explain how these minimal efforts justify visitation in the context of the entire record. For example, while the fact section of father's briefing describes his violent fights with mother, his argument does not address those incidents or explain how it would benefit N.F. to visit with a man with whom she had no meaningful relationship. Father also contends children benefit from having a relationship with a father. However, father fails to connect that generalization to the facts of this case. And even if some evidence could support an inference that visitation might benefit N.F., the record also supports the juvenile court order, and therefore we must affirm. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318–319.)

Father also claims visitation was appropriate because the facts of this case are distinguishable from *In re Joshua R.* (2002) 104 Cal.App.4th 1020. We disagree. In *Joshua R.*, the appellant requested paternity testing three and a half years after learning he was an alleged father, and the juvenile court denied the request. (*Id*. at p. 1022.) His request was based on Family Code section 7551, which requires the court to order genetic testing if " '*paternity is a relevant fact*' " in the proceeding. (*Joshua R.,* at p. 1025.) On appeal, the court recognized that paternity testing could lead to biological father status, which, in turn, would give the juvenile court discretion to order visitation if it would benefit the child. (*Id*. at p. 1026, citing § 361.5, subd. (a).) The appellate court concluded that the juvenile court, in determining paternity

10

was irrelevant, implicitly found that the minor would not benefit from visitation. (*Joshua R.,* at p. 1026.) The court determined that this implicit finding was well supported by the record, which reflected that the appellant delayed requesting a paternity test, had "no relationship" with the child, did not attend a single dependency hearing, and was in prison. (*Ibid.*)

Father asserts the facts of this case are distinguishable from *Joshua R.* because he requested genetic testing "immediately" and attended "most" hearings. He further asserts those efforts support that visitation would benefit N.F. However, like in *Joshua R.*, father was in prison and had no meaningful relationship with N.F. More importantly, while the father in *Joshua R.* had no apparent violent history, father's violent conduct around N.F. and other children further supports the juvenile court ruling.

We find equally unpersuasive father's attempt to distinguish *Elijah V., supra,* 127 Cal.App.4th 576. In *Elijah V.*, a biological father seeking visitation was being investigated for child abuse, had no relationship with the child, and "was in 'no position' " to assume physical custody. The juvenile court declined to order reunification services, and the appellate court affirmed and found no abuse of discretion. (*Id.* at p. 589 ["If he could not take the child, there was no reason to give him services"].)[5] Similarly, here, father had been investigated several

---

[5] The appellate court also concluded that a juvenile court may not "order services for the biological father when a conclusively presumed father exists." (*Elijah V., supra,* 127 Cal.App.4th at pp. 782–783.) Father therefore argues *Elijah V.* is distinguishable because N.F. had no presumed father. However, that distinction only means that the juvenile court in this case

11

times for violence that may have endangered children, including a report that he backhanded a child. Father had no relationship with N.F., and he could not take physical custody of her because he was in prison indefinitely and prohibited from contacting her until 2033. Like in *Elijah V.*, these circumstances support that the juvenile court did not abuse its discretion in declining to order visitation for father.

---

had discretion to order reunification services for father; it does not mean the court was required to do so, nor does it change the abuse of discretion analysis described *ante*.

**DISPOSITION**

The juvenile court orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


HANASONO, J.*


We concur:


EDMON, P. J.


ADAMS, J.

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.